BALDWIN CONSTRUCTION CO., *ET AL.*, PLAINTIFFS-RE-
SPONDENTS, v. ESSEX COUNTY BOARD OF TAXATION
AND CITY OF EAST ORANGE, DEFENDANTS-APPEL-
LANTS.

Argued May 17, 1954—Reargued September 13, 1954—
Decided October 25, 1954.

Mr. *Milton B. Conford*, First Assistant Attorney-General, and Mr. *Joseph A. Murphy*, Assistant Deputy Attorney-General, argued the cause for appellants (Mr. *Grover C. Richman, Jr.*, Attorney-General, Mr. *David D. Furman*, Deputy Attorney-General, and Mr. *James Rosen*, on the brief for the appellant Essex County Board of Taxation; Mr. *Donald Karrakis*, on the brief for the appellant City of East Orange).

Mr. *Herbert J. Hannoch* and Mr. *Blair Reiley* argued the cause for respondents (Mr. *Joseph L. Lippman* and Mr. *Morris Weinstein*, on the brief; Messrs. *Hannoch, Weinstein, Myers & Stern*, Messrs. *Martin & Reiley*, Mr. *Selick J. Mindes*, Messrs. *Levy & Krauss*, Messrs. *Sanderson & Engel*, and Messrs. *Clancy and Clancy*, attorneys).

332

The opinion of the court was delivered by

HEHER, J. By this proceeding in lieu of *certiorari* under *Article* VI, *Section* V, *paragraph* 4 of the *Constitution of 1947*, implemented by *Rule* 3:81–1 *et seq.*, now *R. R.* 4:88–1 *et seq.*, the plaintiff landowners seek relief from what is asserted to be discrimination in the assessments for taxation laid upon their several pieces of property in the City of East Orange for the year 1952, whereby they have been subjected to a disproportionate share of the tax burden in violation of the principle of equality secured by the Fourteenth Amendment to the Federal Constitution and *Article* VIII, *Section* I, *paragraph* 1 of the State Constitution, and the tax statute itself.

The litigation comprises seven separate proceedings at law in lieu of *certiorari* to review 107 increases of land assessments in five municipalities of Essex County, viz., East Orange, Verona, Caldwell, Bloomfield and Belleville. There were other assessment revisions in these and still other municipalities which are not under direct judicial attack. The case now before us relates to the challenged East Orange assessments; but the complaints in all the proceedings are in substance the same.

██ On January 10, 1952 the local assessors in Essex County returned to the Essex County Board of Taxation their several assessment lists and duplicates in accordance with *R. S.* 54:4–35, as amended by *L.* 1943, *c.* 120; and the county board thereupon undertook the performance of its statutory function to examine, revise and correct the tax lists and duplicates, *R. S.* 54:4–46, 54:4–55, an integral part of the assessment process itself. *Hackensack Water Company v. Division of Tax Appeals,* 2 *N. J.* 157, 164 (1949); *Middletown Tp. v. Ivins,* 102 *N. J. L.* 36, 41 (*Sup. Ct.* 1925). On March 10 ensuing, the county board advised the various local assessors by telephone of prospective "changes in some assessments in some parts of the county"; and on March 20 the board ordered specific corrections and revisions of the tax lists, and directed the assessors to conform. The revised East Orange tax list concerns

62 parcels of real property and 13 owners of personal property. There were numerous revisions and corrections of assessments in the several municipalities of Essex County. At a meeting of the various local assessors and the county board held March 24 following, the "Local Assessors," it is averred in the complaint, protested the revision of the East Orange assessments. There were like complaints by other assessors: "Many assessors, including the Local Assessors," asserted that "in picking out properties here and there throughout the County" for increased assessments, the county board visited upon the particular landowners "an unfair share" of the tax burden, but the board's president gave assurances that although the board "had attempted to comply" with the statutory/direction to revise, correct and equalize the assessments, for "lack of time, lack of information and particularly lack of funds (the County Freeholders having allotted only $25,000 to the County Tax Board for this purpose)," the board could not comply with the law and therefore "had undertaken a partial adjustment of some of the assessments," and the law afforded the means of correcting "errors" attending revision under "pressure."

It was also alleged that while the taxable parcels of real property in East Orange numbered 1650, the assessment revisions and corrections involved but 62; that the assessments on parcels of real property fronting Central Avenue were increased 100% as to land, in some cases 200%, and 33 1/3% as to building, but no comparable change was made as to other properties in the immediate area; that there were arbitrary increases in building assessments on this street, irrespective of age or physical condition of the structure, and "Special purpose buildings, designed for particular use of and occupied by owners, were increased in the same manner as buildings designed for general use"; that there was arbitrary discrimination between "residences" and apartment houses, and "changes" in the assessments on business properties were confined to "some, not all, property located within a particular area of Main Street"; and

that "changes" were made in only 13 of 20,000 personal property assessments in the city.

In particular, it is charged in the complaint that the assessment of the land at No. 630 Central Avenue, in the ownership of the plaintiff Doop Realty Co., has been tripled and the building assessment increased by one-third, and the land assessment "is now at the rate of about $1,120 per front foot, as compared with $420 per front foot, the assessment of the adjoining property"; that the land assessment of the plaintiff Savings Investment & Trust Company, at the southeast corner of Central Avenue and Harrison Street, has been doubled and the assessment on the building, which includes its banking house, increased by one-third, and so this plaintiff's land assessment "is at the rate of about $778 per Central Avenue front foot, as compared with about $152 per Central Avenue front foot, the assessment of the property across the street"; that the land assessment of the plaintiff Tishman Realty & Construction Co., Inc., at the northwest corner of Central Avenue and Halstead Street, has been tripled and its building assessment increased one-third, while the assessment of the property on the opposite northeast corner, valued "upon the same basis as plaintiff's property," stands unchanged, and now this plaintiff's land assessment "is at the rate of about $1,000 per Central Avenue front foot (including one corner influence), as compared with about $350 per Central Avenue front foot (including two corner influences) of the adjacent property," and the building assessment is also on "a higher basis than that of the adjacent property."

Referring to a report made to the county board by a committee for "equalization of assessments" organized in 1951 by the Association of Municipal Assessors of Essex County "at the request of and with the approval" of the board, the complaint says that an analysis of all real property sales in Essex County during the year 1950 reveals that "with the exception of industrial properties, real estate located in East Orange was assessed at a higher percentage of full and fair value than the county-wide average"—i. e., the county-wide

average assessment on residence properties was 42.1% of "full and fair value," but the "percentage applicable to East Orange was 49.9%"; on apartment houses (six families and over) the county-wide assessment average was 59.4% of full and fair value, and the East Orange average 64.2%; on commercial properties the county-wide assessment average was 59.8%, and the East Orange average 65.9%; on industrial properties the county-wide assessment average was 66.1%, and the East Orange average 56.5%; and vacant land was assessed at a county-wide average of 59.7%, while the East Orange average was 67.7%. And, generally, it is charged that the 1952 assessments of plaintiffs' properties, "as changed" by the county board, "are in excess of the percentage of full and fair value assessed against other properties of the same class."

The complaint affirms that plaintiffs "have been unable to ascertain exactly what reasons, basis or method, if any, was adopted" by the county board "in singling out plaintiffs' properties for increase in assessments"; but it is charged that the action taken by the board "was not in compliance with any statute or statutory method," but rather "in direct violation thereof," and the increase of plaintiffs' assessments "was intentional and violative of the principle of practical uniformity in assessment," and "discriminatory, arbitrary and capricious."

There is a further allegation that the county board's "sole jurisdiction" to "direct an increase in assessment of *specific* properties in a specific taxing district exists only as a part of a complete revision, correction and equalization of assessed values of *all* the property in a taxing district in order to tax *all* property equally and at full value," and so the particular assessment increases constitute an excess of power. As just said, the constitutional principle of equality is also invoked; and it is urged in the complaint that "where it is impossible to secure both the standard of full value and the uniformity and equality required by law, the latter requirement must be adopted as the just and ultimate purpose of the law." It is also asserted that plaintiffs'

properties "are being assessed in excess of the same standard of value of similar properties in the taxing district of East Orange," in disregard of the mandate of the State Constitution.

Denying that there is a "prompt, effective, efficient or adequate" administrative review "except through these proceedings," the complaint declares that assuming an "available administrative review," "the interests of justice require" that the rule of prior recourse to the administrative forum be relaxed because (a) of the constitutional issues involved; (b) the county board, "the first administrative agency," would be called upon to review its own acts; (c) the great expense and delay and the "repetitious testimony" incident to the prosecution of 30 individual tax appeals; (d) "doubts" as to the jurisdiction of the administrative agencies, particularly its power "under applicable statutes to reduce the assessments on plaintiffs' properties upon the ground of discrimination," and the need for administrative expression of "opinions on questions of law which would clearly be subject to judicial review and which are ultimately questions for the Court."

The prayer of the complaint is that the order of the county board directing the "corrections" and "revisions" of the East Orange 1952 tax list "be vacated and set aside as to properties of plaintiffs, and judgment entered accordingly."

In the Law Division of the Superior Court, the action was sustained by Judge Joseph L. Smith as against a motion to dismiss for want of jurisdiction predicated on the failure to exhaust asserted available administrative remedies. 21 *N. J. Super.* 370 (1952). After answer filed denying the pleaded discrimination and violation of the principle of uniformity, Judge Hughes overruled defendant's motion for summary judgment on the pleadings for lack of jurisdiction of the subject matter and for failure to invoke available administrative remedies, if there be jurisdiction, and, moreover, since the county board is a state administrative agency, *Warren v. Hudson County*, 135 *N. J. L.* 178 (*E. &*

*A.* 1947), the board's action is appealable directly to the Appellate Division of the Superior Court under *Rule* 3:81–8, now *R. R.* 4:88–8. It was found that "the administrative remedy is at best uncertain, if it is not, indeed, nonexistent in the practical sense," and the rule providing for a direct appeal is not applicable. 24 *N. J. Super.* 252 (*Law Div.* 1952). The Appellate Division affirmed. 27 *N. J. Super.* 240 (1953); 28 *N. J. Super.* 110 (1953), after reargument. The holding there was that the county board is not empowered by statute "to remedy an unconstitutionally discriminatory assessment, representing true value or less than true value, by reducing it to the common level of assessments generally."

The case came here by certification at the instance of defendant.

## I

After hearing argument on May 17, 1954, this court *sua sponte* ordered a reargument of the appeal on September 13 ensuing, and directed that meanwhile the parties to the several causes "complete their pleadings, take such depositions and make such inspections" as they should deem proper, and then proceed to trial of the issues in the Law Division of the Superior Court, either separately or together as the trial judge should think fit, to the end of a determination and argument of ensuing appeals "upon the merits, simultaneously with the reargument" of the original appeal, and there was a remand for that purpose.

Accordingly, the causes came on for hearing before Judge Colie on August 12 and 13, following; and there was judgment vacating "as to the plaintiffs and their properties," therein particularized, the order for the assessment increases made by the county board on March 20, 1952, and reducing the several assessments as thus certified "by the amounts of such increases," the "reductions, in each case, to be inclusive of any reductions" theretofore "granted by judgments" of the county board. 32 *N. J. Super.* 18 (*Law Div.* 1954).

Judge Colie found from the depositions, the admissions, and the pleadings that the county board "did not attempt to equalize and did not assess the properties at true value, but fixed the 'revised and corrected' assessments 'in the neighborhood of 50%,'" and this ratio of 50% of true value "was used in all the municipalities in which the properties affected by the order under review were located"; that the board "in certain municipalities selected fixed geographical areas within which the revisions or corrections were made," and "in others it selected specific properties for the same treatment," but "In no instance did the Board make a study of values other than in the areas to be 'revised and corrected,'" other than "those changed," the areas to which they "wanted to limit" their work, "the hot spots, the 100% locations," and then merely by appraising a "typical property," such as "would give a general range of values throughout the section," but which was not in fact "typical for that particular area," and the result was an arbitrary increase of assessments on particular properties, "disregarding all like properties," and an increase of "all assessments within a limited area, disregarding all properties outside that area" within the taxing district, and in the end a "disproportionate tax burden." It was also held that the standard of "true value" was still obligatory by force of the statute. But the assessments made by the local assessors were not disturbed; the increases ordered by the county board were set aside.

We concur in the finding of discriminatory taxation violative of constitutional principle. The proofs show that all lands throughout the affected municipalities were assessed by the local assessors according to a common ratio of value, making for equality and uniformity within the taxing district; and increases in selected areas confined by arbitrarily fixed geographical boundaries of necessity worked discrimination in respect of comparable properties immediately beyond the unreasoned and artificial border line. Indeed, this resulted in varying standards and consequent discrimination as between properties of like kind and character

in the immediate vicinity, on the same and the opposite side of streets bounding the area of action. It was a course of procedure at war with the basic principle of equality; and there ensued glaring disparities in the assessments that are now sought to be excused by the plea that, for lack of funds, assessment uniformity has become a piece-meal process over a period of years. Members of the county board conceded on the witness stand that, in directing the challenged increases, the board was not engaged in the exercise of the equalization function. "This was not an equalization program at all," said one, and the others agreed. And the board's revisions were confined to commercial and industrial properties.

Thus, the assessment increases decreed by the county board would nullify the pattern of equality set by the local assessors through the medium of a uniform assessment ratio, and lay an undue tax burden upon the plaintiff landowners—the certain consequence of their admeasurement by arbitrary percentages and formulae.

## II

We proceed to the jurisdictional and policy questions raised on the original appeal.

There is pleaded here a common remediable grievance arising from a discriminatory tax visitation now established by the proofs, unequal in its incidence and oppressive in its burden; and in the treatment of the issues raised we are to be mindful that this is a judicial proceeding to redress a basic inequality in the apportionment of the charge, violative of constitutional principle. We are not concerned here with failures or omissions in the administrative assessment process not related to inequality of treatment.

By an amendment to the 1844 *State Constitution* adopted in 1875, *Article* IV, *Section* VII, *paragraph* 12, it was directed that property "be assessed for taxes under general laws, and by uniform rules, according to its true value."

Accordingly, the implementing statutes embodied the standard of true value. *L.* 1906, *c.* 120, *R. S.* 54:3–13; *L.* 1918, *c.* 236, *R. S.* 54:4–1, 12, as later amended, 23, also amended; *L.* 1934, *c.* 191, *R. S.* 54:3–17; *L.* 1934, *c.* 191, *R. S.* 54:3–18; *L.* 1918, *c.* 236, *R. S.* 54:4–36, 46, 47, 48.

But the 1947 *Constitution, Article* VIII, *Section* I, *paragraph* 1, provides that property shall be "assessed for taxation under general laws and by uniform rules," and "All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value." The cited enforcement statutes remain unaltered in terms. Yet the dominant principle of the new constitutional mandate is equality of treatment and burden. And this was of the essence and spirit of the old Constitution as well. One of the implementing statutory provisions cited *supra, R. S.* 54:3–13, enjoined the county board to "secure the taxation of all property · * * * at its true value, in order that all (taxable) property * * * shall bear its full, equal and just share of taxes." The standard of value is but a means of achieving uniformity and equality. Such is the preeminent consideration in the distribution of the tax burden.

The common assessment ratio was given recognition under the old constitutional and statutory standard of "true value." *Stratton v. Collins,* 43 *N. J. L.* 562 *(Sup. Ct.* 1881); *Appleget v. Pownell,* 49 *N. J. L.* 169 *(Sup. Ct.* 1886); *State Board of Assessors v. Central R. Co.,* 48 *N. J. L.* 146 *(E. & A.* 1886), Dixon, J. And see the late Justice Black's *Taxation in New Jersey* *(5th ed.* 1940), *section* 145.

And were the constitutional provision of a radically different tenor and import, the equal protection clause of the Fourteenth Amendment would prevail, for the right of equal treatment thereby secured "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class"; he may not complain "if equality is achieved by increasing the same taxes of other members of

the class to the level of his own"; the constitutional require-
ment "is not satisfied if a State does not itself remove the
discrimination, but imposes on him against whom the
discrimination has been directed the burden of seeking an
upward revision of the taxes of other members of the class."
*Hillsborough Township v. Cromwell*, 326 *U. S.* 620, 66
*S. Ct.* 445, 90 *L. Ed.* 358 (1946). This latter was found
to be the case in New Jersey under *Royal Mfg. Co. v. Board
of Equalization of Taxes*, 76 *N. J. L.* 402 (*Sup. Ct.* 1908),
affirmed 78 *N. J. L.* 337 (*E. & A.* 1909), holding that the
county boards are obliged to secure taxation of all property
at its true value, and a taxpayer so assessed who is the
victim of discriminatory taxation may have equalization,
not by reduction of his own assessment, but by proceedings
to raise the assessments of other members of the class, and
so, said Mr. Justice Douglas in the *Hillsborough* case, "it
is plain that the state remedy is not adequate to protect
respondent's rights under the federal Constitution."

Earlier, Chief Justice Taft, noting a conflict of view as
to what should be done where one or a few of a class of tax-
payers are assessed at the full true value of their property,
in accord with a constitutional or statutory requirement,
and the rest of the class are intentionally assessed at a much
lower percentage, in violation of the law, declared:

"This court holds that the right of the taxpayer whose property
alone is taxed at 100 per cent of its true value is to have his assess-
ment reduced to the percentage of that value at which others are
taxed, even though this is a departure from the requirements of
statute. The conclusion is based on the principle that where it is
impossible to secure both the standards of the true value, and the
uniformity and equality required by law, the latter requirement is
to be preferred as the just and ultimate purpose of the law." *Sioux
City Bridge Co. v. Dakota County*, 260 *U. S.* 441, 43 *S. Ct.* 190,
67 *L. Ed.* 340 (1923).

*Vide Cumberland Coal Co. v. Board of Revision of Tax
Assessments*, 284 *U. S.* 23, 52 *S. Ct.* 48, 76 *L. Ed.* 146
(1931); *Iowa-Des Moines National Bank v. Bennett*, 284
*U. S.* 239, 52 *S. Ct.* 133, 76 *L. Ed.* 265 (1931).

 But it goes without saying that mathematical precision in the valuation of property for taxation is not requisite, nor is it attainable. Absolute equality is impracticable. The design of the equal protection clause of the Fourteenth Amendment, related to the particular field, is security against intentional systematic discrimination, and thus to insure the substance of the basic right of equality; mere errors of judgment are not enough; "There must be something more,—something which, in effect, amounts to an intentional violation of the essential principle of practical uniformity." *Sunday Lake Iron Co. v. Wakefield Township,* 247 *U. S.* 350, 38 *S. Ct.* 495, 62 *L. Ed.* 1154 (1918); *Sioux City Bridge Co. v. Dakota County,* cited *supra.* To the same effect: *Cumberland Coal Co. v. Board of Revision of Tax Assessments,* cited *supra; Iowa-Des Moines National Bank v. Bennett,* cited *supra.*

 The course taken here is sustainable as a proceeding for the redress of plaintiffs' grievances arising from the exercise of what is in essence the administrative assessing process, an historic function of the common-law *certiorari,* although the scope of the review depends upon the statute. *State v. Bentley,* 23 *N. J. L.* 532 (*Sup. Ct.* 1852); *State v. Betts,* 24 *N. J. L.* 555 (*Sup. Ct.* 1854); *Wyckoff v. Nunn,* 39 *N. J. L.* 422 (*Sup. Ct.* 1877); *Royal Mfg. Co. v. Mayor and Common Council of City of Rahway,* 75 *N. J. L.* 416 (*Sup. Ct.* 1907); *Trenton and Mercer County Traction Corporation v. Mercer County Board of Taxation,* 92 *N. J. L.* 398 (*E. & A.* 1918); *Gibbs v. State Board of Taxes and Assessment,* 101 *N. J. L.* 371, 372 (*E. & A.* 1925); *Lehigh Valley R. R. Co. v. State Board of Taxes and Assessment,* 102 *N. J. L.* 576 (*Sup. Ct.* 1926); *Pennsylvania Railroad Co. v. State Board of Taxes and Assessment,* 103 *N. J. L.* 28 (*Sup. Ct.* 1926); *Phi Zeta of Lambda Chi Alpha Fraternity v. City of New Brunswick,* 123 *N. J. L.* 237 (*Sup. Ct.* 1939); *Meltzer v. Division of Tax Appeals,* 134 *N. J. L.* 510 (*Sup. Ct.* 1946). *Vide R. S.* 54:4-59; 54:4-61, as amended by *L.* 1953, *c.* 51; 54:4-62, also amended by the act of 1953.

*R. S.* 54:4–46 and 54:4–47, as amended by *L.* 1947, *c.* 413, empower the county board to "revise, correct and equalize" the assessed value of "all property in the respective taxing districts, increase or decrease the assessed value of any property not truly valued," assess omitted property "at its true value," and in general "do everything necessary for the taxation of all property in the county equally and at its true value." And the action thus taken is reviewable on *certiorari* at the instance of an aggrieved property owner, for the redress of his grievance, even though the administrative remedies have not been exhausted, if that course be in the interest of essential justice. *Rule* 3:81–14, now *R. R.* 4:88–14. *Vide Town of Kearny v. State Board of Taxes and Assessment*, 103 *N. J. L.* 26 (*Sup. Ct.* 1926).

The right invoked here is that of equal treatment—relief from what is obviously discriminatory taxation; and judicial interposition may be had for the correction of the wrongful discrimination. Such is the remedy sought by the plaintiff property owners, and equalization of treatment will fully redress the wrong.

The plaintiff landowners also urge that the statute commands the county board to "fix assessments at true value," and since the board "knowingly and wilfully disobeyed this mandate," its order, "for that reason, is a nullity."

But, if that be so, then the original assessments made by the local assessors are likewise a nullity; and this would be untenable. The drastic consequences of such a course are readily perceivable. Would it not logically and necessarily follow that all assessments in the given municipality be vacated merely for nonconformance with the standard of "true value," and reassessment directed now, nearly three years after the event, when taxes have quite generally been paid and transfers of properties made on the basis of the unchallenged local assessments? The alternative would be the invalidation of the assessments laid against plaintiffs; and this in itself would be discriminatory. The judicial power here invoked is directed merely to the rectification of the tax inequality forbidden by the Federal and State

Constitutions. Indeed, counsel concedes as much in asking only that the assessment increases be vacated and the assessments made by the local assessors restored.

The application of this principle will not work inequality in the apportionment of the county tax burden among the taxing districts. The aggregate method provided by *R. S.* 54:4–52 affords the means of securing inter-municipal equality. *Borough of Totowa v. Passaic County Board of Taxation*, 5 *N. J.* 454 (1950). And there is like provision for inter-county parity and equivalence for the apportionment on the state level of the "State school tax, State tax or State moneys, as provided by law," and lately for the "calculation and apportionment of distributions pursuant to the State School Aid Act of 1954." *R. S.* 54:1–33, 34, 35; *L.* 1954, *c.* 85, *N. J. S. A.* 18:10–29.30 to 18:10–29.48, and *c.* 86, *N. J. S. A.* 54:1–35.1 to 54:1–35.5. By the earlier statute, the state authority is directed to inquire into and determine the "general ratio or percentage of full value at which the real property within each county is assessed and listed for taxation," and to prepare a state equalization table of county ratables according to true value, for the stated apportionment; and by the act of 1954, the director is enjoined to determine the "ratio of aggregate assessed to aggregate true valuation of real estate of each taxing district," and he may make such determination "by reference to the county equalization table whenever he is satisfied that the table has been prepared according to accepted methods and practices and that it properly reflects true value or a known percentage thereof for the several taxing districts in the county." The equalization table thus provided is the statutory mechanism for obviating disparity in the apportionment of state taxes and distributions due to varying local assessment ratios. A common assessment ratio such as we have here insures equality of burden within the taxing district. This is mathematical truth.

If the assessing authority fails in its peremptory duty under the Constitution and laws, then resort may be had to the remedies appropriate to the particular default. Here,

we redress the injury sustained by plaintiffs; this is the only justiciable controversy before us; we are not concerned with administrative deficiencies in no way vital to that inquiry.

■ This is a proceeding in the nature of *certiorari* to remedy the undue discrimination suffered by the plaintiff landowners, neither more nor less. The complaint prays merely that there be judgment vacating the "corrections" and "revisions" of the particular municipality's 1952 tax list directed by the county board. *Certiorari* is a common-law mode of review to correct errors of law apparent on the face of the record or proceedings of an inferior judicial or *quasi*-judicial tribunal. *Brandon v. Board of Com'rs of Town of Montclair*, 124 *N. J. L.* 135 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940); *State v. Court of Common Pleas*, 1 *N. J.* 14 (1948). *Mandamus* issues to compel, and *certiorari* to review, official or judicial action. *West Jersey & S. R. Co. v. Board of Public Utility Commissioners*, 85 *N. J. L.* 468 (*Sup. Ct.* 1914), affirmed 87 *N. J. L.* 170 (*E. & A.* 1915); *Beronio v. Pension Commission of City of Hoboken*, 130 *N. J. L.* 620 (*E. & A.* 1943).

■■ True, the form of the remedy invoked cannot ordinarily serve to abridge the plaintiff's right to relief within the issues framed by the pleadings and sustained by the proofs. Yet it is fundamental that a court of original jurisdiction, criminal or civil, at law or in equity, "cannot enter a judgment which is beyond the claim asserted, or which, in its essential character, is not responsive to the cause of action on which the pleading was based." *Sattelberger v. Telep*, 14 *N. J.* 353, 363 (1954). Compare *Bennett v. Butterworth*, 11 *How.* 669, 13 *L. Ed.* 859 (1850). The doctrine of *res judicata* is operative only as to questions within the issues tendered by the pleadings, save where consent or waiver rule otherwise. *North Carolina R. Co. v. Story*, 268 *U. S.* 288, 45 *S. Ct.* 531, 69 *L. Ed.* 959 (1925); *Ash Sheep Co. v. United States*, 252 *U. S.* 159, 40 *S. Ct.* 241, 64 *L. Ed.* 507 (1920); *In re Yahn's Estate*, 258 *Wis.* 280, 45 *N. W.* 2d 702, 25 *A. L. R.* 2d 652 (*Sup. Ct.* 1951);

*Shores v. Hooper*, 153 *Mass.* 228, 26 *N. E.* 846, 11 *L. R. A.* 308 (*Sup. Jud. Ct.* 1891). The relief afforded must perforce be consistent with the issues and the proofs.

In the very nature of the proceeding here, the judgment cannot take the shape of a *mandamus* directed to the local assessing authorities bearing upon the mode and manner of the *in futuro* performance of their statutory functions. Plaintiffs have not invoked such judicial power; and that course would have no relation whatever to the redress of their several pleaded grievances. The pleadings and a judgment so fashioned would not be in proper sequence. Why should the mandate be confined to the Essex County Tax Board? Would not that of and by itself savor of the reprehended inter-county discrimination? Aud would not the extension of the *mandamus* to all state and local assessment authorities be outside the compass of this litigation, and so nugatory? That would seem to be indisputable.

We need not now address ourselves to questions that may arise under other and different circumstances involving a claimed denial of the constitutional principle of uniformity and equality and the mode of procedure to vindicate the right. It suffices to say that here it is established that assessments made according to a uniform rate or measure were altered by the county board to work a denial of the individual equality secured by the organic law, and the remedy lies in striking down the discriminatory action.

The order denying summary judgment for defendants on the pleadings, and the final judgment vacating the assessment increases made by the county board, are accordingly affirmed; and the cause is remanded for conforming action.

VANDERBILT, C. J. (dissenting). The fundamental question on this appeal, which is of vital interest to every citizen in New Jersey, is whether property in New Jersey shall be assessed at true value in compliance with the numerous statutes of this State requiring it or, as the majority holds, the plaintiff taxpayers (and with them all other citizens) shall be relegated merely to the protection of the Federal Consti-

tution, leaving our statutes relating to assessment at true value as dead letters on the books.

The law, the facts, and the proceedings before us, not to mention sound public policy, all dictate that our statutes relating to assessment at true value be applied to the pending case according to their clear and obvious intent. In doing so we would, of course, be complying as well with the requirements of the Federal Constitution, banning discrimination which no one, of course, favors.

1. *Our Statutes Require Property Assessments at Full Value.*

The majority opinion holds that *all* that the plaintiff taxpayers before us are entitled to is the elimination of discrimination against them by reducing their taxes to the point where they are equalized with those of other taxpayers in the municipality in accordance with the requirements of the equal protection clause of the Fourteenth Amendment to the Federal Constitution as enunciated in *Hillsborough Township v. Cromwell,* 326 *U. S.* 620, 66 *S. Ct.* 445, 90 *L. Ed.* 358 (1946). It declines to give effect in this case to the many statutes requiring assessments at true value and to the plaintiffs' claim for relief on that ground.

Consistently and without deviation since 1875 the standard for taxation as laid down in our law has been and still is assessment at *true value.* It was to overcome the difficulties which are still plaguing us in this state of unequal and unfair assessments for taxation that *Article* IV, *Section* VII, *par.* 12, was added in 1875 to the *Constitution of* 1844:

"Property shall be assessed for taxes under general laws, and by uniform rules, *according to its true value.*" (Emphasis supplied throughout)

All the statutes passed pursuant thereto (or to the corresponding provision of the 1947 Constitution, to which I shall refer

in due course) have uniformly adhered at every level of the taxing machinery—municipal, county and state—to this standard of true value.

Starting at the local level, *N. J. S. A.* 54:4–1 provides that "All property * * * shall be subject to taxation * * * *at its true value,* and shall be valued by the assessors of the respective taxing districts. * * *" *N. J. S. A.* 54:4–23 defines the true value of real estate; it requires the assessor to "determine *the full and fair value* of each parcel of real property situated in the taxing district at such price as, in his judgment, it would sell for at a fair and *bona fide* sale by private contract on October first next preceding the date on which the assessor shall complete his assessments." By *N. J. S. A.* 54:4–36 each assessor is required to annex to his assessment list an affidavit stating among other things:

"I, * * * do swear (or affirm) that the foregoing list contains the valuations made by me to the best of my ability, of all the property liable to taxation in the taxing district in which I am the assessor, and that I have valued it, without favor or partiality, *at its full and fair value,* at such price as in my judgment it would sell for at a fair and *bona fide* sale by private contract on October first last, * * *."

Likewise at the county level, we find the county boards of taxation created expressly to "secure the taxation of all property in the county *at its true value"*:

"Each county board of taxation shall secure the taxation of all property in the county *at its true value,* in order that all property, except such as shall be exempt by law, shall bear *its full, equal and just share of taxes." R. S.* 54:3–13.

The same standard of assessment at true value is imposed in the two specific modes of action authorized by the statute for the county boards of taxation, first in appeals by aggrieved taxpayers from local assessors to the county board of taxation, which is directed under *N. J. S. A.* 54:3–22 to "revise and correct the assessment *in accordance with the true value of the taxable property,"* and second, in proceedings

under *N. J. S. A.* 54:4–47 on the county board's own motion to correct assessments to true value:

"The county board may adjourn from time to time in the discharge of its duties, and may, after investigation, revise, correct and equalize the assessed value of all property in the respective taxing districts, increase or decrease the assessed value of any property *not truly valued*, assess property omitted from any assessment, as provided by law, at its *true value*, and in general do everything necessary for the taxation of all property in the county *equally and at its true value.*"

It is under this last-mentioned section of the statute that the present proceedings were taken.

Similarly at the state level "any appellant who is dissatisfied with the judgment of the county board of taxation * * * may appeal from that judgment to the Division of Tax Appeals in the State Department of Taxation and Finance" and on such proceedings "each petition of appeal * * * shall contain a general prayer that the assessment be increased or decreased (as the case may be) *to the true value thereof,*" *N. J. S. A.* 54:2–39.

It is difficult to conceive of a standard of assessment that would be more simple or more fair than the standard of assessment at true value, yet notwithstanding its simplicity and fairness and the clarity of these constitutional and statutory directions to the taxing authorities to assess at true value, it is a matter of common knowledge that assessments on real property in this State have not been made at true value, creating, among other untoward results, disparity in the burden of the taxpayers in various municipalities with respect to their county taxes, for even the explicit statutory directions to the county boards of taxation to equalize taxes as between taxing districts in the county have for the most part gone unheeded, *R. S.* 54:3–15 to 19, along with most of the other supervisory provisions of the tax statutes. Briefly, *R. S.* 54:3–15 requires the members of the county boards of taxation to inspect so far as possible the properties in the varying taxing districts and to "make their revision and cor-

rection after such view and inspection." *R. S.* 54:3–16 gives the county board "supervision and control" over the local assessors, who "shall, in making assessments, be governed by such rules, orders or directions" as the county board may issue, provided they are first approved by the State Tax Commissioner. *R. S.* 54:3–17 to 19 states one method of obtaining such equalization of total assessments as between taxing districts according to true value:

"Each county board of taxation shall annually ascertain and determine, according to its best knowledge and information, the general ratio or *percentage of full value* at which the real property of each taxing district is assessed according to the tax lists laid before the board. It shall prepare an equalization table showing the assessed valuation of the real property in each district, the ratio *or percentage, if any, by which the assessed valuation* should be *increased or decreased in order to correspond to true value,* and the true value of the real property within the district as determined by it. A copy of the table shall be mailed to the assessor of each district, and be posted at the courthouse, at least one week before the hearings provided for in section 54:3–18 of this title." (*R. S.* 54:3–17)

A hearing for the interested assessors is provided by *R. S.* 54:3–18, and then by *R. S.* 54:3–19 the county equalization table as confirmed by the board is directed to be filed with "the state tax commissioner [now the director of division of taxation], the state board of tax appeals [now the division of tax appeals], the state comptroller and each taxing district in the county."

The functions of the State Tax Commissioner (now the Director of Division of Taxation) in the equalization process are set forth in the statute:

"The commissioner shall annually, after receiving from the county boards of taxation the abstracts of ratables as last certified by such boards, inquire into and determine the general ratio *or percentage of full value* at which the real property within each county is assessed and listed for taxation, and shall prepare a state equalization table of county ratables, showing the assessed valuation of real and personal property in each county, the ratio or percentage, if any, by which the assessed valuation of real property of each county should be increased or decreased *to correspond to true value,* and the *true valuation of real property as determined by him.* A copy of the

table shall be mailed to the county board of taxation and director of the board of freeholders of each county, and to the state comptroller, and posted at the state house, at least ten days before the hearing provided for in section 54:1–34 of this title." (*R. S.* 54:1–33)

"The commissioner shall sit annually on the second Tuesday in July at his office in Trenton, for the purpose of equalizing the assessments between the several counties. At that time a hearing shall be given to the county boards of taxation and representatives of the boards of freeholders for the purpose of determining the accuracy of the ratios and *true valuations of property* as shown in the state equalization table, and the commissioner shall confirm or revise such table *in accordance with the facts.* The hearing may be adjourned from time to time, but the equalization shall be completed by August twenty-fifth. At the first hearing any county may object to the ratio or valuation of any other county, but no increase in any valuation as shown in the table shall be made without giving a hearing, after five days' notice to the board of freeholders of the county affected." (*R. S.* 54:1–34)

"The commissioner shall prepare an abstract of the total ratables of the State, as returned by the county boards of taxation and corrected or confirmed by him in accordance with the State equalization table, and transmit a certified copy thereof to the State Board of Tax Appeals, the county boards of taxation and the State Comptroller, who shall apportion the State school tax, State tax or State moneys, as provided by law, upon the ratables as shown in such abstract, which shall take the place for all such purposes of the annual abstracts heretofore filed by county boards of taxation in the office of the Comptroller under the provisions of section 54:4–52 of this Title." (*R. S.* 54:1–35)

According to the records of the Division of Taxation, only a few counties attempt true equalization by increasing or decreasing assessed valuations yearly among taxing districts (in 1952 Bergen and Burlington; in 1953 Bergen and Middlesex; and in 1954 Bergen, Burlington, Middlesex, Passaic and Warren) as required by the statute; the equalization process within counties has been as much a dead letter, in operation, as assessments at true value. Likewise it appears from the records of the Director of the Division of Taxation that he has not prepared a state equalization table of county ratables as required by *R. S.* 54:1–33–34–35, *supra;* statewide equalization has thus been as much a dead letter in operation as the equalization process within counties and the levying of assessments at true value in the various municipalities. The vice of this situation rests not only in discrimination

between taxpayers of different municipalities with respect to the burden of county taxation within the same county, but in the encouragement that a shifting standard of valuation lends to inequalities in assessments within the same municipality, a matter of which I shall speak later at length. The administrative breakdown in the enforcement by the taxing authorities of the constitutional and statutory standard of true value and in the equalization of taxes at true value as required by the statutes has been facilitated by the difficulties heretofore placed in the way of a resort to the courts by an aggrieved taxpayer. The crucial case is *Royal Manufacturing Company v. Board of Equalization of Taxes,* 76 *N. J. L.* 402 (*Sup. Ct.* 1908), affirmed 78 *N. J. L.* 337 (*E. & A.* 1909), where it was held that a taxpayer whose property is not assessed at more than true value has no standing to complain, because under the 1875 amendment to the former Constitution all property must be assessed at true value; accordingly, even if he was discriminated against in favor of other taxpayers, he cannot have his assessment reduced, but rather must seek to raise the assessments of those whose assessments are lower than his. This legalistic decision not only frustrated the clear intent of the 1875 amendment by placing on the individual taxpayer an intolerable burden, which he could not possibly hope to meet by reason of the sheer expense of such a suit, but even if he brought such a suit it offered no promise of his obtaining assessment at true value for all taxpayers. This unfortunate decision which ignored the realities of the taxing process ushered in the era of what the public and the press when its possibilities came to be understood called "tax lightning." The Commission on State Tax Policy euphemistically but graphically expressed the existing situation in its *Fifth Report* (1950; · p. 4):

"The administration of the general property tax (real estate and improvements) is a chaos. On the business side it is a matter of *a more or less gentle bargaining process* that over the years has *created a host of insecure but 'favorable' conditions.*"

This statement is documented with complete county by county tables in its *Sixth Report* (1953; *p.* 30). At *page* 27 the Commission summarized its findings as follows:

["Real estate in New Jersey is assessed at an average assessment ratio of 34 per cent of its value. On this basis, the State-wide average tax rate of $6.77 per $100 valuation taxable in 1952 represents an average effective tax burden of $2.30 per $100 of full value.

The estimated average assessment ratios vary as among the 21 New Jersey counties from a low of 16 per cent in Ocean County to a high of 56 per cent in Hudson County. Six of the State's 21 counties show estimated average assessment ratios above the over-all State-wide average of 34 per cent and three of them (Hudson, Essex and Passaic) show estimated average assessment ratios above 40 per cent. On the other extreme, four counties (Ocean, Burlington, Sussex and Salem) show estimated average assessment ratios of under 20 per cent.

The variation as among individual municipalities ranges from estimated average assessment ratios *under* 10 *per cent in seven municipalities to over* 60 *per cent in two municipalities.*"

Its conclusion (*p.* 133) seems inescapable:

"*Never has so much money been raised from so many people so inequitably as in the current administration of the local tax on real estate.*"

· Here we have conclusions of fact documented by years of competent study by an official commission that we cannot afford to ignore in the consideration of such vital issues.

In the *Hillsborough* case, *supra*, 326 *U. S.* 620, 66 *S. Ct.* 445, the tax collector of a small New Jersey community with total assessed valuations for all property, both real and personal, of $3,139,020, levied assessments in the amount of $221,940,438 upon the intangible property belonging to an individual resident and to a trust of which she was trustee. This assessment would have resulted in additional tax payments of nearly $7,000,000 per year as compared with the township's annual budget of approximately $97,000, an outrageous instance of "tax lightning" which had become prevalent in various parts of the State. In that case the United States Supreme Court, which seemed more aware of the

economic and political realities of taxation than our courts, correctly criticized the *Royal Manufacturing Company* decision for failing to accord the taxpayer the protection to which he was entitled under the Federal Constitution:

"The equal protection clause of the Fourteenth Amendment protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class. The right is the right to equal treatment. He may not complain if equality is achieved by increasing the same taxes of other members of the class to the level of his own. The constitutional requirement, however, is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class. *Sioux City Bridge Co. v. Dakota County*, 260 *U. S.* 441, 445–447, 43 *S. Ct.* 190, 191, 192, 67 *L. Ed.* 340 * * *; *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 *U. S.* 239, 247, 52 *S. Ct.* 133, 136, 76 *L. Ed.* 265; *Cumberland Coal Co. v. Board of Revision [of Tax Assessments]*, 284 *U. S.* 23, 28–29, 52 *S. Ct.* 48, 76 *L. Ed.* 146. The courts of New Jersey in a long line of decisions have held that a taxpayer who has been singled out for discriminatory taxation may not obtain equalization by reduction of his own assessment. His remedy is restricted to proceedings against other members of his class for the purpose of having their taxes increased. The rule was stated in *Royal Mfg. Co. v. Board of Equalization [of Taxes]*, 76 *N. J. L.* 402, affirmed in 78 *N. J. L.* 337, as follows: '* * * the county boards are required to secure taxation of all property at its true value; so that the fact that the property of A is assessed at its true value and the property of other taxpayers within the same district is assessed below its true value, affords A no ground for demanding a reduction of his valuation, though it does entitle him to apply for an increase in the valuation of the others.' 76 *N. J. L.*, *pages* 404, 405. On the basis of that rule it is plain that the state remedy is not adequate to protect respondent's rights under the federal Constitution." (326 *U. S.*, at *pages* 623–624, 66 *S. Ct.* at *page* 448.)

Had our courts applied the same reasoning and the same requirements of proof in the *Royal* case, the 1875 amendment and the implementing statute would have been quickly complied with by the taxing authorities.

The question of law now before us is whether this court will ignore the clear and consistently repeated statutory mandate for the assessment of property at true value or direct the defendants to perform their solemn duty by assessing

property at true value. The relief against inequality of assessment secured by the Fourteenth Amendment requires the reduction of the aggrieved taxpayer's assessment to the general level of assessments "even though this is a departure from the requirement of [state] statute," *Sioux City Bridge Co. v. Dakota County, supra,* 260 *U. S.* 441, 446, 43 *S. Ct.* 190, 192, 67 *L. Ed.* 340, and that we must and should give effect to under the Hillsborough case, but a state court may not content itself merely by doing so when its statutes direct assessments at true value and the plaintiffs, as here, insist on the statutes being lived up to. By assessing all property at true value—and only by so doing—can both the state law and the Federal Constitution be complied with. It is the duty of our courts to require the proper discharge by the assessing authorities of their clear obligation to both the law of this State and the Federal Constitution, not to condone their violation of the law of New Jersey.

*2. The 1947 Constitution Leaves the Statutes Requiring Property Assessments at True Value in Full Force and Effect.*

It is conceded by all parties that the statutes hereinbefore quoted remain in full force under the Constitution of 1947, yet the defendant county board of taxation would have us ignore their mandate, as I understand its position, on the basis of the new tax provision of the 1947 Constitution which supersedes the 1875 amendment and which reads as follows:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts *shall be assessed according to the same standard of value;* and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district." (*Art.* VIII, *Sec.* I, *par.* 1)

It is clear beyond the slightest doubt (1) that it is for the Legislature alone to enact the general laws and to prescribe or authorize the prescription of the uniform rules referred

to in the quoted constitutional provision, and (2) that it has done so in retaining on the books the statutes requiring assessments of property at true value and in not substituting any other standard. That, indeed, is conceded by the majority ("The cited enforcement statutes remain unaltered *in terms*"), but from the use of the phrase "in terms" and the majority's failure to give force to the standard of true value, I take it to mean that the full value statutes are to remain as unused and ineffective as heretofore.

The defendant county tax board contends that the dominant principles of the new constitutional mandate as to taxation are equality of treatment and burden, but does not the legislative standard of assessment at true value— the only standard the Legislature has prescribed—provide equality of treatment and burden? Indeed, what standard could do so more effectively than assessments at true value?

The defendants urge that the standard of value is but a means of achieving uniformity and equality, but is it not for the Legislature to decide how these objectives shall be achieved and by what standard of values? And has not the Legislature in an unbroken series of statutes prescribing the duties of local, county and state taxing officials fixed the standard of value at true value and true value alone? This whole question was resolved by this court only two years ago in requiring assessments at the statutory standard, *i. e.,* true value, in *Deleware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 433:

"The constitutional restraint is upon the Legislature when enacting statutes for the assessment of the two classes of property. The Legislature has enacted the same standard of value for both. Tax receipts derived from the assessment of Class II property in railroad use are allotted to and paid over to the local taxing districts in which such property is situated, each taxing district receiving the total amount of tax derived from the assessment of such property situated within the district. *N. J. S. A.* 54:29A–24. The standard of assessment of such property prescribed by *N. J. S. A.* 54:29A–17 to be employed by the Director is 'true value.' This is the identical standard prescribed for the assessment of locally assessed lands by local assessors. *R. S.* 54:4–1. *Neither the Director nor the local*

*assessor has any authority but to make the respective assessments at true value in compliance with the statutory provision applicable to him.*"

The defendants ignore this holding and argue that the common assessment ratio was given recognition under the old constitutional and statutory standard of true value, but the cases they cite have nothing to do with the taxation of property in general which concerns every citizen. They relate to such special classes of property as bank stock, *Stratton v. Collins*, 43 *N. J. L.* 562 (*Sup. Ct.* 1881); and railroads, *State Board of Assessors v. Central R. Co.*, 48 *N. J. L.* 146 (*E. & A.* 1886); *Appleget v. Pownell*, 49 *N. J. L.* 169 (*Sup. Ct.* 1886), in contrast with which it is to be noted that *Delaware, L. & W. R. Co. v. City of Hoboken, supra,* is a clear holding of this court to the contrary only two years ago, merely deals with the taxpayer's right to a writ of *certiorari* and has nothing to do with standards.

The defendants would limit the action of this court to the doctrine of the *Hillsborough* case, *supra,* as being consistent with its views of our past and present constitutional and statutory provisions. One cannot quarrel with the decision of the *Hillsborough* case under the Fourteenth Amendment, but the *Hillsborough* case itself paid its respects in no uncertain terms to the earlier decisions of our courts in such fashion as to arouse us to their shortcomings.

3. *The Plaintiff Taxpayers are Seeking to Force the Taxing Authorities to Assess at Full Value and They Are Entitled to Such Relief.*

The plaintiff taxpayers assert in their complaint not only their undoubted right to equality of treatment under the Fourteenth Amendment and the *Hillsborough* case, but also their right to assessments levied at true value in accordance with our Constitution and the statutes. Thus paragraph 18 of the complaint sets forth in full the requirement of our Constitution that real property be assessed "according to the same standard of value," and the following paragraphs

quote from the various pertinent statutes herein referred to requiring assessments at full value. The Appellate Division of the Superior Court recognized that the issue of assessment at full value was before it when it stated:

"Respondents, * * * filed a complaint * * * charging * * * that the increases resulted, not in the accomplishment of the statutory mandate to bring about the taxation of all property in the county or in the taxing district equally and at its *true value*, * * *." 28 *N. J. Super.* 110.

The defendant board of taxation presented under point 4 of its original brief in this court its contention that although the complaint set forth that the county board had failed to levy the increased assessments in accordance with the requirements of the New Jersey Constitution, still the assessments were valid, utterly misconstruing *Delaware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 433 (1952), *supra,* as holding that the constitutional provision was a mandate to the Legislature and not to the assessing officials. The plaintiff taxpayers, of course, briefed the matter under point 10 of their original brief and argued it extensively at the oral argument. On the reargument point 3 of the county tax board's brief bore the following caption:

"The County Board can revise and correct assessments to the percentage of full value used in the municipality and need not revise and correct 100% of full value where such percentage has not been applied by the local assessor in making his assessments."

while the plaintiffs' answering argument was entitled:

"Our statutes command the County Board to fix assessments at true value. The Board knowingly and wilfully disobeyed this mandate. Its order, for that reason, is a nullity."

and the question was argued by both sides.

The right asserted by the plaintiffs to have all property assessed at true value is not an administrative matter; it is a matter in the highest degree substantive and we are not redressing fully the injuries sustained by the plaintiffs

merely by enjoining discrimination in assessments. The plaintiffs are entitled to have all property assessed at true value, because otherwise the evil consequences pointed out by the State Tax Policy Commission (*supra*) are inevitable. It is difficult enough to achieve assessment at true value, but when various scales of percentages of true values ranging as we have seen from less than 10% to over 60% (at the oral argument counsel for the county tax board frankly stated that there is one municipality with an assessment ratio of 8% to true value) are employed by the local assessors without warrant of law or any publication thereof, the average citizen has no yardstick to guide him in determining whether his assessment is in line with his neighbor's. He is working in the dark as to an essential factor in the computation of his tax. The very existence of such an unknown percentage of true value as the basis of assessment inexorably leads to discrimination and the very lack of equality which the majority would banish. Worse than that, it leads to what the State Tax Policy Commission tactfully and with rare restraint calls "*a matter of more or less gentle bargaining process that over the years has created a host of insecure 'favorable' conditions.*" Putting the matter bluntly, it means that many have obtained tax favors at the expense of others, by means not disclosed. It also means that many others are afraid to appeal their existing assessments under the *Royal* case for fear of retaliation. This is not a situation that should be permitted to prevail once it is brought to the attention of a court of general jurisdiction. It creates a rule not of law, but of favoritism. The difficult art of assessment is rendered impossible of accomplishment.

I can conceive of no issue more important for decision or crying more loudly for our adjudication, nor can I imagine any sound reason for not deciding the issue. No dire consequences would flow from recognizing the existence of the statutes commanding assessment at true value and giving effect to them. The partial assessments of all property would not, of course, be a nullity, as the majority thinks; the assessments would simply be increased to full value.

Our courts are not and never have been put in the absurd position where they must either affirm or deny a judgment; modification of a judgment is a familiar solution of many appeals. It may well be that it would be impossible to enforce these statutes for the year 1952 without untoward results, but the taxing process is an annual occurrence and the court can and should give directions to the taxing authorities to avoid a repetition of their violation of the statutes in question. It can and should do so for the taxes which are to be assessed as of October 1, 1954 for the tax year 1955 and also for the taxes to be assessed in all subsequent years. Such a course would be in accord with familiar principles of law. This, as we have said, is a proceeding in lieu of a prerogative writ. Such actions, though administered for historical reasons in the Law Division proceed on equitable principles. Thus in *Ward v. Keenan,* 3 *N. J.* 298, 309 (1949), we said:

"In determining what course to pursue under the new practice in this field we should look to the decisions on the old procedure on prerogative writs, not as controlling authorities but for what light they may throw on the instant problem of presenting sound rules of procedure. Much light may also be gained from examining the practice in analogous cases of *equitable procedure,* for it is becoming increasingly clear, now that discretion in granting of the writ has been abolished, that the procedural principles applicable in the two fields are in many respects identical."

Among the well known equitable principles guiding judicial action is the rule that equity will not make a vain decree. "Decrees that would in the final result be nugatory should not be made," *Fiedler, Inc., v. Coast Finance Co., Inc.,* 129 *N. J. Eq.* 161, 169 (*E. & A.* 1941). Manifestly, an order made in the summer of 1954 to reassess at true value for the year 1952 all the property in Essex County—a process that would necessarily take many months—would completely upset the taxing machinery of the municipalities and of the county, if indeed the data for such a reassessment for 1952 were available, which is doubtful. Not only for this reason but also because it would seriously interfere with the current work of the county board of taxation, such an order would

indeed prove to be an ineffective and vain decree. On the other hand, we should not hesitate to authorize the trial court to direct the county board of taxation to conform to all of the pertinent statutes requiring assessments at full value for the year 1955 and all subsequent years.

Accordingly, I would instruct the trial court to order the defendant Essex County Board of Taxation to take the necessary steps to see to it that the assessments for the year 1955 throughout the county are made at true value as of October 1, 1954, *R. S.* 54:4–23, in accordance with the pertinent statutes and not to approve any tax duplicates of the local assessors that are not prepared on the basis of true value, *R. S.* 54:4–35, *R. S.* 54:4–47. There is every reason to believe that the Essex County Board of Taxation would welcome such instructions because it is one of the few county tax boards that has made any steps in the direction of equalization. If we do not take such action we not only deprive private litigants of relief on a basic right of very real importance to them but we will be flaunting the will of the Legislature without anyone being furnished any mode of relief and the acts providing for assessment at true value would continue as dead letters on the statute book. It cannot be doubted that many assessors who are now subjected to political and personal pressures would welcome relief therefrom by direction of the courts directing assessments at full value just as the police and municipal magistrates rejoiced in the protection which the nonfixable traffic violations ticket afforded them. But in the light of what has gone on in this State for years, the assessors cannot be expected to conform to the statutes directing assessments at true value without explicit direction from this court. Indeed, were any of them to proceed to levy assessments on property in their taxing districts in the face of this court's studied refusal to countenance the true value statutes they would be in danger of being deemed recreant to the local custom of assessment at some undisclosed percentage under true value.

Nor should the plaintiff taxpayers fail in their pursuit of assessments at full value by reason of any of the niceties of

procedure that surrounded the use of the prerogative writs at common law and that were abolished by the new Constitution and the rules adopted pursuant thereto. It was to avoid such technicalities that it was provided in the Constitution of 1947:

"Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, as of right, except in criminal causes where such review shall be discretionary." *Art.* VI, *Sec.* V, *par.* 4.

I would affirm the judgment below with instructions to the trial court as herein indicated.

I am authorized to state that Mr. Justice BRENNAN joins in this opinion.

*For affirmance*—Justices HEHER, OLIPHANT, WACHEN-FELD, BURLING and JACOBS—5.

*For modification*—Chief Justice VANDERBILT and Justice BRENNAN—2.