## ASH SHEEP COMPANY *v.* UNITED STATES.

### APPEAL FROM AND ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

Nos. 212, 285.   Argued January 30, 1920.—Decided March 1, 1920.

Whether or not by a cession of lands from an Indian tribe the United States becomes trustee for the Indians or acquires an unrestricted title depends in each case upon the terms of the agreement or treaty by which the cession is made.  P. 164.

The Act of April 27, 1904, c. 1624, 33 Stat. 352, amending and ratifying an agreement with the Crow Indians, established the relation of trustee and beneficiary, the Indians ceding their possessory rights in certain lands of which the fee was in the United States and the United States undertaking to sell them (sections 16 and 36 excepted) to settlers and to apply the proceeds in specified ways for the benefit of the Indians.  *Id.*

Such lands, therefore, are not "public lands" of the United States, but are Indian lands, within the meaning of Rev. Stats., § 2117, which imposes a penalty for driving stock to range and feed on any land belonging to any Indian or Indian tribe without the tribe's consent. P. 166.

Considered in the light of its purpose, early origin and long practical construction, Rev. Stats., § 2117, includes sheep under the term "cattle."  *Id.*

The rule of strict construction is not violated by allowing the words of a penal statute to have full meaning or the more extended of two meanings, where such construction best harmonizes with the context and most fully promotes the objects of the legislation.  P. 170.

An action by the United States to recover a statutory penalty for a trespass is not barred by an earlier decree in equity awarding it an injunction and nominal damages but denying a claim for the penalty as incompatible with the equity jurisdiction.  *Id.*

250 Fed. Rep. 591; 254 *id.* 59, affirmed.

THE cases are stated in the opinion.

*Mr. C. B. Nolan*, with whom *Mr. Wm. Scallon*, was on the brief, for appellant and plaintiff in error:

When the Act of 1904 was passed, the title to the land was in the United States, and the only right of the Indians was a possessory right, *Johnson* v. *McIntosh*, 8 Wheat. 543; *Spaulding* v. *Chandler*, 160 U. S. 394; which could be terminated by act of Congress as well as by treaty or agreement with the Indians, *Beecher* v. *Wetherby*, 95 U. S. 517; *Buttz* v. *Northern Pacific Ry. Co.*, 119 U. S. 73; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553. When this right of occupancy terminated or was abandoned with the approval of the United States, all of the Indian rights were extinguished. *Buttz* v. *Northern Pacific Ry. Co.*, *supra; United States* v. *Cook*, 19 Wall. 591.

The cession to the United States is unqualified and unconditional. The manner of the disposal of the land, practically, under all of the land laws of the United States, rendering necessary its examination by the public, would preclude the idea that the Indian Department should exercise jurisdiction over it. It was the intention that every portion should at all times be accessible to the public, so that settlements might be made by those intending to do so under the homestead and other laws, and leasing by the Indian Department necessarily would interfere with this being done. If any trust arose at all, it attached to the money which was to be paid, and not to the land itself. *United States* v. *Choctaw Nation*, 179 U. S. 494; *Bean* v. *Morris*, 159 Fed. Rep. 651; *s. c.* 221 U. S. 485.

It is also needless to say that when lands are thrown open to exploration and settlement they are no longer reserved. So far as we know, no definition of the term "public lands" requires that the lands should be open to entry under all of the general laws relating to public lands. *Newall* v. *Sanger*, 92 U. S. 761; *Northern Lumber Co.* v. *O'Brien*, 139 Fed. Rep. 614; *United States* v. *Blendaur*, 128 Fed. Rep. 910; *Jackman* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 24 N. Mex. 278. If the land is reserved under the jurisdiction of the Indian Bureau, what is the position

of the homesteader or the purchaser from the State? The right of the State to the school sections or to sections acquired in lieu thereof attached and became fixed before the land was thrown open to settlement. The State could sell these. The land of the homesteader or of the purchaser from the State might be surrounded by lands not yet sold. Such person might find access to his land barred by a lessee of the Indian Department, who, under its regulations might fence up all of the leased lands. These lands are either reservation lands or public lands. They cannot be both. The statutes relating to public lands and those relating to reservation lands are so different that they cannot be applied at the same time and in the same district. Great confusion would result from such an attempt.

Even if held in trust the lands would be no longer "reserved" or "reservation" or "Indian" lands. *Quoad* the public, they are open to homesteaders; to exploration and location by prospectors; the title of the State to the school sections, or to lieu sections, has become fixed. These can be sold or leased by the State. It goes without saying, that the homesteader or locator or the purchaser from the State has a right of ingress and egress not resting on permission from an Indian agent or the Indian Department.

But no trust affects the land. Congress did not intend to limit or modify the title of the United States,—already the owner in fee absolute. The Indians ceded only the right of occupancy, which Congress might have ended without their agreement. How can it be maintained that Congress intended to give the Indians an equitable right in the lands themselves?

It is not the policy of the United States to give Indians any title except upon the breaking up of the tribal relations, and then only in severalty. The correct view is that the trust was simply an undertaking to treat the proceeds as trust funds and to act in the matter of the sale as a

trustee might act.   Such a course cannot properly be held
to affect the title of the sovereign or to affect the land at
all.   No trust is expressed to hold, care for, manage or
lease for the Indians.

Section 2117, Rev. Stats., is penal, and the rule of strict
construction applies.   *United States* v. *Lacher*, 134 U. S.
624; *Sarlls* v. *United States*, 152 U. S. 570; *United States*
v. *Harris*, 177 U. S. 305; *United States* v. *Gooding*, 12
Wheat. 460; *Greely* v. *Thompson*, 10 How. 225; *Baldwin*
v. *Franks*, 120 U. S. 678; *Tiffany* v. *National Bank of
Missouri*, 18 Wall. 409.

The term "cattle" in ordinary usage never includes
sheep.   If the act intended otherwise, why mention horses
and mules specifically?   The term "cattle" as generally
understood is confined to animals of the bovine species.
*Esser* v. *District Court*, 42 Nevada, 218; *Rossbach* v.
*United States*, 116 Fed. Rep. 781; *United States* v. *Schmoll*,
154 Fed. Rep. 734; *United States* v. *Ash Sheep Co.*, 229
Fed. Rep. 479; *Keys* v. *United States*, 2 Okla. Crim. Rep.
647.   In the original act horses and cattle only were men-
tioned.   The amendment of 1834 added mules, unneces-
sarily, if the Government's contention is correct.

In the equitable action the Government insisted that
the statute fixed the amount of the damage, and that it
was entitled to recover one dollar per head.   The trial
court decided against it, and that decision stands unap-
pealed from and is final.   *Forsyth* v. *Hammond*, 166 U. S.
506; *Southern Pacific R. R. Co.* v. *United States*, 168 U. S.
1; *Wabash Gas Light Co.* v. *District of Columbia*, 161 U. S.
316; *United States* v. *Ash Sheep Co.*, 229 Fed. Rep. 479;
*Kendall* v. *Stokes*, 3 How. 87; *Union Central Life Ins. Co.*
v. *Drake*, 214 Fed. Rep. 536.


*Mr. Assistant Attorney General Nebeker*, with whom *Mr.
W. W. Dyar*, Special Assistant to the Attorney General,
was on the brief, for the United States.

MR. JUSTICE CLARKE delivered the opinion of the court.

These two cases were argued and will be decided together.

No. 212 is an appeal from a decree, entered in a suit in equity, in favor of the Government granting a permanent injunction restraining the appellant from trespassing upon described lands in Montana by grazing sheep thereon and for nominal damages for such trespass.

No. 285 is a proceeding in error, in which reversal is sought of a judgment rendered in an action at law against plaintiff in error, appellant in the equity suit, for a penalty for the same trespass.

The validity of the right asserted by the Government, in both cases, turns upon whether the lands involved were "Indian lands" or "Public lands." If they were the former, the decree in the equity case should be affirmed, but in the law case there would remain the question as to whether "sheep" were within the terms of the act under which the penalty was imposed.

In both cases the Government contends that the appellant violated § 2117 of the Revised Statutes of the United States, which reads as follows:

"Every person who drives or otherwise conveys any stock of horses, mules, or cattle, to range and feed on any land belonging to any Indian or Indian tribe, without the consent of such tribe, is liable to a penalty of one dollar for each animal of such stock."

The company admits that it pastured 5,000 sheep on the described lands without the consent of the Crow tribe of Indians or of the United States, but denies that they were "Indian lands" and contends that they were "Public lands," upon which it was lawful for it to pasture its stock.

Whether the described lands were Indian or Public lands depends upon the construction to be given the Act of Congress, approved April 27, 1904, c. 1624, 33 Stat. 352, en-

titled "An Act To ratify and amend an agreement with the Indians of the Crow Reservation in Montana, and making appropriations to carry the same into effect."

The agreement embodied in this act of Congress provided for a division of the Crow Indian Reservation in Montana on boundary lines which were described, and the lands involved in this case were within the part of the Reservation as to which the Indians, in terms, "ceded, granted, and relinquished" to the United States all of their "right, title and interest."

The argument of the Sheep Company is that the United States being owner of the fee of the land before the agreement, the effect of this grant and release of their possessory right by the Indians, was to vest the complete and perfect title in the Government, and thereby make the territory a part of the public lands with the interest of the Indians transferred to the proceeds to be derived from them. For this conclusion the following cases are cited: *United States* v. *Choctaw Nation,* 179 U. S. 494; *Bean* v. *Morris,* 159 Fed. Rep. 651; *s. c.* 221 U. S. 485. But in the first of these cases the Indians parted with their possessory rights for a cash payment by the United States (p. 527), and in the second, the character of the agreement under which the Indian title was said, incidentally, to have terminated, does not appear.

Whether or not the Government became trustee for the Indians or acquired an unrestricted title by the cession of their lands, depends in each case upon the terms of the agreement or treaty by which the cession was made. *Minnesota* v. *Hitchcock,* 185 U. S. 373, 394, 398; *United States* v. *Mille Lac Band of Chippewa Indians,* 229 U. S. 498, 509.

The agreement we have in this case is elaborate and, in consideration of the grant by the Indians of their possessory right, the Government assumed many obligations with respect to the lands and the proceeds of them,—not-

ably, that it would sell the land to settlers, except sections 16 and 36, for not less than four dollars per acre and would pay the proceeds to the Indians, under the direction of the Secretary of the Interior, in a manner prescribed. Thus, the Government contracted to expend; $90,000 of the proceeds of the land in the extension of the irrigation system on the reservation remaining; $295,000 in the purchase of stock to be placed on the reservation, with a further contingent purchase in contemplation of $200,000; $40,000 in fencing; $100,000 for schools, and $10,000 for a hospital for the Indians, for the maintenance of which $50,000 additional was to be held in trust. It was further provided, that to the extent that feasible irrigation prospects could be found, parts of the released lands should be withdrawn under the Reclamation Act and be disposed of within five years, but not for less than four dollars an acre.

There were many other like provisions, all intended to secure to the Indians the fullest possible value for what are referred to in the agreement as "their lands" and to make use of the proceeds for their benefit.

It was provided that semi-annual reports should be made by the Secretary of the Interior to the Indians, showing the amounts expended from time to time and the amounts remaining in each of the several funds.

It is obvious that the relation thus established by the act between the Government and the tribe of Indians was essentially that of trustee and beneficiary and that the agreement contained many features appropriate to a trust agreement to sell lands and devote the proceeds to the interests of the *cestui que trust*. *Minnesota* v. *Hitchcock*, 185 U. S. 373, 394, 398. And that this was precisely the light in which the Congress regarded the whole transaction, is clear from the terms of the concluding section, the eighth:

"That nothing in this Act contained shall in any manner bind the United States to purchase any portion of the land

herein described, except sections sixteen and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this Act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided." (33 Stat. 352, 361.)

Taking all of the provisions of the agreement together we cannot doubt that while the Indians by the agreement released their possessory right to the Government, the owner of the fee, so that, as their trustee, it could make perfect title to purchasers, nevertheless, until sales should be made any benefits which might be derived from the use of the lands would belong to the beneficiaries and not to the trustee, and that they did not become "Public lands" in the sense of being subject to sale, or other disposition, under the general land laws. *Union Pacific R. R. Co.* v. *Harris*, 215 U. S. 386, 388. They were subject to sale by the Government, to be sure, but in the manner and for the purposes provided for in the special agreement with the Indians, which was embodied in the Act of April 27, 1904, 33 Stat. 352, and as to this point the case is ruled by the *Hitchcock* and *Chippewa Cases, supra,* Thus, we conclude, that the lands described in the bill were "Indian lands" when the company pastured its sheep upon them, in violation of § 2117 of Revised Statutes, and the decree in No. 212 must be affirmed.

There remains the question as to the construction of Rev. Stats., § 2117.

In the law case it is admitted in the bill of exceptions that the Sheep Company, without the permission of the Crow tribe of Indians or of the United States, drove, ranged and grazed 5,000 head of sheep on the land described in the complaint, and that at the time no settle-

ment or entries thereon had been authorized under acts of Congress. The judgment against the company was for $5,000,—one dollar for each sheep pastured on the land.

The company contends that the judgment should be reversed for the reason that Rev. Stats., § 2117, imposes the penalty prescribed, only, for ranging and feeding on the lands of an Indian tribe without permission "any stock of horses, mules, or cattle" and that "sheep" are not within its terms.

If this were a recent statute and if we were giving it a first interpretation we might hesitate to say that by the use of the word "cattle" Congress intended to include "sheep."

But the statute is an old one which has been interpreted in published reports of the courts for almost fifty years, and in an opinion by the Attorney General of the United States, rendered in 1884, as fairly comprehending "sheep" within the meaning of the word "cattle" as used in it.

The statute first appears as § 2 of an "Act to regulate Trade and Intercourse with the Indian Tribes, and to preserve Peace on the Frontiers," enacted in 1796 and was then applicable only to "any stock of horses or cattle," etc. (1 Stat. 469, 470). The section was reënacted without change in 1802 (2 Stat. 139, 141). In 1834 [Act June 30, 1834, c. 161, § 9, 4 Stat. 729, 730] it was given its present form, which was carried into the Revised Statutes, without change in the wording we are considering (Rev. Stats., § 2117).

In 1871 suit was brought in the United States District Court for the District of Oregon, claiming that penalties under the section had been incurred by pasturing "sheep," as in this case, on Indian lands without the consent of the tribe. In a carefully prepared and clearly reasoned opinion Judge Deady overruled a demurrer to the complaint. and held that "sheep" were clearly within the mischief to be remedied and fairly within the language of the act.

This case has not been overruled or modified by any later decision. The court quotes definitions of the word "cattle" from several dictionaries, emphasizing especially, this from the 1837 edition of Webster:

"In its primary sense, the word includes camels, horses, asses, all the varieties of domesticated horned beasts of the bovine genus, sheep of all kinds and goats, and perhaps swine. . . . Cattle in the United States, in common usage, signifies only beasts of the bovine genus."

Upon this authority and applying the rule that in determining the legislative intent the mischief to be prevented should be looked to and saying that "it will not be denied that sheep are as much with the mischief to be remedied as horses or oxen," the court concludes:

"I have no hesitation in coming to the conclusion that the word cattle, as used in the Indian Intercourse act of 1834, includes, and was intended to include sheep, as well as cows and oxen." *United States* v. *Mattock*, 2 Sawy. 148.

Twelve years later, in 1884, the Attorney General of the United States, in an opinion to the Secretary of War, regarded the question as so little doubtful that he disposed of it in this single sentence:

"The standard lexicographers place sheep under the head of cattle, and it would seem to be in derogation of the manifest intention of Congress to take the word in a more confined sense." 18 Ops. Atty. Gen. 91.

In 1874, in *Decatur Bank* v. *St. Louis Bank*, 21 Wall. 294, this court held that the word "cattle" in a letter of credit guaranteeing "drafts on shipments of cattle" was comprehensive enough to justify the giving of credit on shipments of "hogs." This pertinent paragraph is from the opinion:

"That stock of some kind formed part of the guarantee is quite plain, but is the word 'cattle' in this connection to be confined to neat cattle alone, that is, cattle of the bovine genus? It is often so applied, but it is [quoting

from Worcester's Dictionary] 'also a collective name for domestic quadrupeds generally, including not only the bovine tribe, but horses, asses, mules, sheep, goats, and swine.' In its limited sense it is used to designate the different varieties of horned animals, but it is also frequently used with a broader signification as embracing animals in general which serve as food for man. In England, even in a criminal case, where there is a greater strictness of construction than in a civil controversy, pigs were held to be included within the words 'any cattle.'"

The most recent definitions of the dictionaries are as follows:

Webster's New International Dictionary defines "cattle" thus: "Collectively, live animals held as property or raised for some use, now usually confined to quadrupeds of the bovine family, but sometimes including all domestic quadrupeds, as sheep, goats, horses, mules, asses, and swine, etc."

The Standard Dictionary defines the word as meaning: "Domesticated bovine animals, as oxen, cows, bulls, and calves; also, though seldom now as compared with former times, any live stock kept for use or profit, as horses, camels, sheep, goats, swine, etc."

Thus, although the word "sheep" is not in the section, and although in present day usage the word "cattle" would rarely be used with a signification sufficiently broad to include them, nevertheless: since the pasturing of sheep is plainly within the mischief at which this section aimed; since the word "cattle," which is used, may be given, say all the authorities, a meaning comprehensive enough to include them; and since the courts and the Department of Justice for almost fifty years have interpreted the section as applicable to "sheep," we accept this as the intended meaning of the section,—for had it been otherwise Congress, we must assume, would long since have corrected it.

It is argued that the rule that penal statutes must be strictly construed forbids such latitude of construction. But this is sufficiently and satisfactorily answered by repeated decisions of this court.

"The admitted rule that penal statutes are to be strictly construed is not violated by allowing their words to have full meaning, or even the more extended of two meanings, where such construction best harmonizes with the context, and most fully promotes the policy and objects of the legislature." *United States* v. *Hartwell*, 6 Wall. 385; *United States* v. *Freeman*, 3 How. 556, 565; *United States* v. *Lacher*, 134 U. S. 624, 628.

It is also contended, far from confidently, that the recovery of nominal damages in the equity suit is a bar to the recovery of the penalty in the case at law. While the amount of the statutory penalty for the trespass was prayed for in the equity suit, yet the trial court, saying that equity never aids the collection of such penalties, *Marshall* v. *Vicksburg*, 15 Wall. 146, 149, and that no evidence of substantial damage had been introduced, limited the recovery to one dollar and costs. Rejection of a claim because pursued in an action in which it cannot be entertained does not constitute an estoppel against the pursuit of the same right in an appropriate proceeding. We agree with the Court of Appeals that "a judgment is not conclusive on any question which, from the nature of the case or the form of the action, could not have been adjudicated in the case in which it was rendered."

It results that the decree in No. 212 and the judgment in No. 285 must both be

*Affirmed.*