## EASTERN SHOSHONE TRIBE, Plaintiff,

### v.

**NORTHERN ARAPAHO TRIBE; Richard A. Brannan; Anthony A. Addison, Sr.; Harvey T. Spoonhunter; Ernest M. Lawson; Nelson P. White, Sr.; Hubert N. Friday; Northern Arapaho Housing Authority; Frank Armajo; John Lujan; Department of Housing and Urban Development; Henry G. Cisneros, Secretary, Department of Housing and Urban Development; Vernon Haragara; Department of Interior, Bureau of Indian Affairs; Bruce Babbitt, Secretary, Department of Interior; Ada E. Deer, As-**

---

sistant Secretary for Indian Affairs; Keith Beartusk, Billings Area Director; United States Department of Health and Human Services; Donna E. Shalala, Secretary; Jon Fogarty, Indian Health Service Staff Engineer, Defendants.

No. 96–CV–17–J.

United States District Court,
D. Wyoming.

Feb. 16, 1996.

John C. Schumacher, David R. Martin, Law Office of John Schumacher, Fort Washakie, WY, for plaintiff.

Andrew W. Baldwin, Berthenia S. Crocker, Baldwin & Crocker, Lander, WY, Nicholas Vassallo, U.S. Attys. Office, Cheyenne, WY, for defendants.

## ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND DISMISSING COMPLAINT

ALAN B. JOHNSON, Chief Judge.

The above captioned matter came before the Court for hearing on plaintiff's motion for temporary restraining order on January 23 and 24, 1996. Appearing as counsel for plaintiff were John C. Schumacher and David R. Martin of Fort Washakie, Wyoming; appearing for the Northern Arapaho Tribe defendants were Andrew W. Baldwin and Berthenia S. Crocker of Lander, Wyoming; appearing for the federal defendants was Nicholas Vassallo, Assistant United States Attorney for the District of Wyoming, Cheyenne, Wyoming.

The Court, having considered the motion, the verified complaint, all documents filed by the parties in support of their respective positions, testimony and evidence received at the hearing, arguments of counsel, and being fully advised in the premises, FINDS and ORDERS as follows:

## Background and Contentions of the Parties

Plaintiff's complaint asserts allegations that arise out of the receipt and expenditure of housing funds by the Northern Arapaho Housing Authority ("NAHA") in 1995 after receiving funds from the Department of Housing and Urban Development ("HUD").[1] In January of 1995, the Northern Arapaho Tribe enacted Northern Arapaho Tribe Ordinance No. 63 which provided for formation of a public corporation, NAHA, an Indian Housing Authority, pursuant to the exercise of the Tribe's governmental police power to promote the general welfare of the Tribe, and pursuant to applicable HUD regulation permitting an Indian Housing Authority ("IHA") to be formed by tribal ordinance. 24 C.F.R. § 905.126.[2]

In 1963, the Eastern Shoshone Tribe and the Northern Arapaho Tribe together formed

---

1. There is a companion suit that has been filed in tribal court. The Court was advised by counsel at the hearing that the allegations in that suit, with few exceptions, are essentially the same as are asserted in the instant proceeding.

2. In 1995, the rules and regulations relating to the Indian Housing Program were amended, removing Part 905 and adding Part 950, with the effective date of May 10, 1995. Part 950 contains the Indian Housing consolidated regulations that were previously set forth in 24 CFR part 905. 24 C.F.R. § 950.126 also relates to establishment of IHAs by tribal ordinance and provides:

    (a) Legal capacity of tribe to establish IHA. Where an Indian tribe has governmental police power to promote the general welfare, including the power to create a housing authority, an IHA may be established by tribal ordinance enacted by the governing body of the tribe.

    (b) Form of ordinance. The form of tribal ordinance shall be determined by the tribe and reviewed by the ONAP Administrator. The IHA shall also demonstrate that it has the legal authority to develop, own, and operate a public housing project under the Act. Unless an IHA is created as part of the tribal government, ordinances shall include language that allows the IHA to sue and be sued in its corporate name. A sample format will be provided by HUD.

    (c) Approval or review of ordinance. HUD shall not enter into an undertaking for assistance to an IHA formed by tribal ordinance unless such ordinance has been submitted to HUD.

    (d) Submission to HUD of documents establishing IHA. (1) The tribal ordinance shall be submitted to HUD prior to receiving financial assistance. (2) An IHA must certify that it has enacted the ordinance pursuant to any constitutional law or practice and has the local cooperation required by law.

the Wind River Housing Authority ("WRHA"). Since its formation, WRHA has participated in HUD's Indian housing programs providing for housing on the Wind River Reservation in central Wyoming. The testimony at trial indicated that WRHA is similar to a joint powers board, in that it acts on behalf of and with the participation of members of both the Eastern Shoshone and Northern Arapaho Tribes, the two tribes living on the Wind River Reservation.

The plaintiff asserts that the historical relationship of the two tribes on the Wind River Reservation is essential to an understanding of its claims in this case. The Eastern Shoshone Tribe ("EST") originally occupied lands in Colorado, Idaho and Utah. In 1868, the EST moved to a reservation in Wyoming and occupied the territory now known as the Wind River Reservation.

In 1878, the Northern Arapaho Tribe ("NAT") was allowed to settle on the Wind River Reservation without the consent of the Eastern Shoshone Tribe. The United States Supreme Court has held that since 1878, the EST and NAT have been equitable owners and sovereigns in common of the Wind River Reservation. Plaintiff cites *Shoshone Tribe v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937) ("Shoshone Tribe I") and *United States v. Shoshone Tribe,* 304 U.S. 111, 113, 58 S.Ct. 794, 82 L.Ed. 1213 (1938) ("Shoshone Tribe II"), and *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920) in support of the proposition that the two Tribes are equitable owners and sovereigns in common of the Wind River Reservation.

By various acts of legislation, Congress restored all undisposed of lands in the opened portion of the reservation in common to the two Tribes and common sovereign status exclusive of any state interest which may have existed. Since enactment of the Act of May 19, 1947, 61 Stat. 102, 25 U.S.C. § 611 et seq., all income derived from Tribal property held in common by the two Tribes has been divided evenly.

Plaintiff asserts that by treaty and Act of Congress, the United States owes an established fiduciary duty to the Tribes which obligates the United States to protect the interests of the Eastern Shoshone Tribe, remain loyal to the Tribe, and advance the Tribe's interests. However, each Tribe also has an inherent tribal sovereignty. The United States Supreme Court has held that the NAT has a one-half interest in the Reservation and that there is common jurisdiction between the Tribes over sovereign matters, with the exception of internal matters such as enrollment and certain other matters which each Tribe deals with separately and exclusively.

The Wind River Housing Authority was established jointly by both Tribes in 1963 by the adoption of Ordinance No. 4 (June 5, 1963). Since the late 1970s the two Tribes have discussed splitting the Wind River Housing Authority into two housing authorities. However, no steps had ever been taken to accomplish that result as of the date of the hearing.

Plaintiff contends that when the NAT established its own housing authority in 1995, pursuant to Northern Arapaho Tribe Ordinance No. 63, the NAT exceeded its authority in chartering that public corporation without the concurrence of the EST. Plaintiff contends that EST concurrence is required because the entity operates within the area subject to joint tribal regulation and control. Plaintiff asserts that the actions of the NAT violate the duties owed to a common sovereign with coequal rights.

As to the other defendants, plaintiff asserts that the Tribal defendants, NAHA, and Frank Armajo worked together to the detriment of the EST in seeking HUD approval of NAHA and Northern Arapaho Tribe Ordinance No. 63, and through their collective actions, prevented the Wind River Housing Authority from operating. The EST asserts it has been damaged in that its common right to exercise sovereign powers relative to the Wind River Reservation has been eviscerated and the interests of its citizens have been damaged. Plaintiff also asserts that EST was damaged when WRHA lost its funding for 20 units of housing needed to meet the needs of Tribal members, through the rescission of funds.

With respect to the federal defendants, plaintiff's general allegations are that HUD approved NAHA as an Indian Housing Authority contrary to applicable statute and regulation and without full compliance with its established regulatory application scheme. Plaintiff asserts, without citation of authority, that a tribe may receive funds through only one Indian housing authority and that NAT receives funding through both WRHA and NAHA. Plaintiff also contends that Vernon Haragara, the administrator of Native American programs for HUD for the Rocky Mountain Region, ignored HUD directives and processed rescission of funds in a manner disproportionately impacting the EST.

The defendants objected to the issuance of a temporary restraining order. The defendants noted that a suit containing nearly identical allegations as the instant suit has been filed in Tribal Court. In that action, as in this action, the relief sought requires the deciding court to first consider matters of Tribal law. These are matters that should first be litigated between the two Tribes in Tribal Court. Defendants argue that this Court should defer to the Tribal Court and abstain from exercising jurisdiction.

The defendants assert this case is one which presents only issues concerning review of agency action pursuant to Section 702 of the Administrative Procedure Act. Those issues challenge the official recognition of NAHA by HUD and challenge the rescission of funds that had been awarded but not yet obligated to the WRHA. The defendants also assert that the rescission of funds committed but not yet obligated to WRHA occurred primarily because WRHA failed to submit the necessary documentation in a timely manner. This has nothing to do with recognition of NAHA by HUD.

The defendants also assert that the temporary restraining order should not issue because NAHA has already commenced construction of the project, construction is ongoing, contracts have been entered into, and families have been displaced. They argue that if plaintiff is entitled to relief, money damages are available and are adequate compensation. Defendants assert that there is no immediate need for relief, as plaintiff knew NAHA was recognized as an entity by HUD over six months ago. They also argue that it is not in the public interest to prevent the planned construction of housing on the reservation.

The NAT defendants noted that traditionally WRHA sought funding based on the housing needs of the entire reservation, splitting funds received equally between the two Tribes. However, this practice resulted in a fundamental disparity between housing available to members of the two tribes because the ratio of members of the Northern Arapaho Tribe to the Eastern Shoshone Tribe is approximately 2:1. This has caused a chronic shortage of housing for the NAT over the years.[3]

Defendant disputes the contention that cooperation between the Tribes in certain matters of joint interest creates "common sovereignty" precluding each of the separate sovereigns from exercising separate functions. The theory of "common sovereignty," defendant argues, is untested and novel and does not rise to the level of federal law sufficient to present a federal question giving this Court jurisdiction over the case. Defendants contest plaintiff's assertion that a tribe may participate in only one Indian housing authority and argue that there is no

3. The testimony of Frank Armajo, formerly executive director of WRHA and presently executive director of NAHA, indicated that there are roughly 5800 enrolled members of the Northern Arapaho Tribe and 3000 enrolled members of the Eastern Shoshone Tribe on the Wind River Reservation. His testimony indicated that funding was awarded to WRHA by HUD in the past by assessing overall housing need on the reservation, rather than assessing need by Tribe, and assessing that need relative to the needs of other IHAs. He indicated at the peak, WRHA had 600 units available which were occupied, and that there were 300 applicants waiting for new housing or for existing units to become available. Traditionally, the WRHA had allocated an even split by Tribe (i.e., 150 units to the EST, 150 units to NAT) although the waiting list actually was comprised of 184 NAT applicants and 99 EST applicants. Applications submitted by WRHA to HUD gave gross numbers and were not broken out by Tribe, so that as far as HUD was concerned, total need was determined on total reservation considerations, rather than a per tribe basis.

law preventing a tribe from creating its own housing authority, in the manner provided for by existing federal law.

Many of the underlying facts are hotly disputed by defendants, particularly the allegations asserted by plaintiff concerning Northern Arapaho WRHA board members' refusal to meet and cooperate as necessary to obtain HUD funding. The Annual Contributions Contract ("ACC") had been approved by the WRHA Board, including its Northern Arapaho Board members, on July 10, 1995, seventeen days before the rescission of funds by Congress became effective law on July 27, 1995.[4] The WRHA, for whatever reason, simply failed to submit the ACC to HUD in a timely manner, even though it had notice of the impending rescission of funds by Congress.[5]

### Standard for Preliminary Injunction

■ Under Rule 65 of the Federal Rules of Civil Procedure, the Court may grant a temporary restraining order. A movant seeking issuance of a preliminary injunction in the Tenth Circuit must demonstrate:

(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the oppos-

ing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). When the last three requirements are met, a movant may satisfy the likelihood of success on the merits requirement by raising serious questions going to the merits. *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986), citing *Otero Savings & Loan Association v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981).

■ A temporary restraining order is a subspecies of the preliminary injunction. It may be granted without notice to the adverse party "upon a summary showing of its necessity in order to prevent immediate and irreparable injury, pending a fuller hearing and determination of the rights of the parties or the court's jurisdiction upon a motion for preliminary injunction." 7 J. Moore, J.D. Lucas, K. Sinclair, *Moore's Federal Practice* ¶ 65.05 (2d ed. 1989). The temporary restraining order expires within such time, not to exceed ten days, after entry as the Court fixes. If the temporary restraining order is

---

4. The Affidavit of Cheryl Arthur, the Acting Executive Director for WRHA, indicated that on March 1, 1995 she submitted to Vernon Haragara, of the HUD Office of Native American Programs, the application for low-rental and mutual help homes pursuant to the Notice of Funding Availability for the Traditional Indian Housing Development Program for Fiscal Year 1995. On April 21, 1995, she received notice from HUD of a program reservation for WRHA for 20 units, and that the grant application for mutual help units had not been funded for fiscal year 1995. As stated in her affidavit, after issuance of a program reservation, an ACC must be executed. Her affidavit indicates the WRHA ACC was approved by the board on July 10, 1995.

5. In early 1995, as indicated by the testimony of Vernon Haragara and Frank Armajo, it was common knowledge that Congress was contemplating a rescission of Indian housing authority funds. March 8, 1995, a notice was sent to all tribal chairpersons notifying them of a meeting to be held March 17, 1995 in Rapid City, South Dakota to deal with rescission and funding issues. The rescission became law on July 27,

1995. The total amount of funds to be recaptured in the Rocky Mountain Region, through recapture of unobligated funds was $10,700,-000.00. Mr. Haragara indicated that no direct guidance was provided by HUD on how to recapture funds, although mention was made of recapture of unobligated funds in housing programs. Haragara indicated that his office looked at all projects which had unobligated funds as a source of capture, and indicated that there were three ACCs that had not been submitted in a timely fashion, although these housing authorities had been notified of the impending rescission. These three housing authorities included the Turtle Mountain Housing Authority, the Blackfeet Housing Authority, and the Wind River Housing Authority. Although the Wind River Housing Authority had been awarded 20 units, the funds were unobligated and because of the failure to submit a timely ACC, i.e., on or before July 27, 1995, monies for the project were rescinded. Mr. Armajo indicted that NAHA had its ACC into HUD before June 1995.

granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time. Fed. R.Civ.P. 65(b).

## Discussion

The relief requested by plaintiff will be denied. The reasons for the Court's decision are threefold: first, lack of standing as asserted by the federal defendants, second, lack of subject matter jurisdiction as it applies to the NAT defendants, and third, a failure to show that drastic relief of a temporary restraining order is required to afford effective relief in this case.

This Court elects not to rule on abstention issues, except to say this Court would be hesitant to act against the NAT defendants in view of the fact that these disputes appear to involve Tribal laws and unresolved matters as to the relationship between the two Tribes on the Wind River Reservation, matters that the Tribal Court could properly rule on in the first instance.

### 1. Standing

■ The federal defendants have argued that the issue of standing is jurisdictional in nature and for standing to exist, the plaintiff must allege personal injury "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief[,]" citing *Doyle v. Oklahoma Bar Assn.*, 998 F.2d 1559, 1566 (10th Cir.1993). The defendants argue that the injury complained of—the loss of HUD funding through a rescission of federal funds by Congress and the President—cannot be fairly traced to the federal defendants' allegedly unlawful conduct.[6]

This Court agrees with these arguments. The Tenth Circuit stated in *Doyle:*

> For standing to exist, the plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." ... The injury must be "distinct and palpable," ... as opposed to abstract, conjectural, or merely hypothetical.... Thus, one does not have standing to assert a violation of rights belonging to another, since the person entitled to a right is the only one who can be *directly* injured by its deprivation....

*Doyle v. Oklahoma Bar Assn.*, 998 F.2d at 1566 (citations omitted).

There are no allegations in plaintiff's complaint that suggest a cognizable link between HUD's recognition of NAHA and the rescission of WRHA funding, nor was there any testimony at the hearing that would have suggested such a link ever existed at all. Stated another way, there was no evidence whatsoever as to the injury complained of, i.e., that the plaintiff EST was wronged by the activities of HUD when it approved NAHA and awarded funds to NAHA. The plaintiff's complaint would indeed require this Court to engage in conjecture and speculation. It is difficult to see how this Court could begin to resolve the issues raised in plaintiff's complaint so as fashion any sort of meaningful remedy and give effect to EST's asserted claim of common sovereignty, especially as it purports to require a 50:50 ratio for division of funds and housing on the Wind River Reservation, issues which have apparently never been considered at the Tribal level in the first instance.

---

6. The testimony at trial, including that of Vernon Haragara, Administrator of the Office of Native American Program, HUD, Rocky Mountain Region, discussed very generally the process involved when an Indian housing authority seeks to obtain development funding. Funds are appropriated by Congress and monies are allocated to HUD through the Office of Management and Budget. Upon receipt, funds are sub-allocated to field offices for further distribution. A *Notice of Funding Availability* is published, outlining the requirements, criteria, and procedures for applying for funds. A List of Eligibles is determined by HUD. Both successful and unsuccessful applicants for funding are subsequently notified. Letters are issued to successful applicants, informing them of a program reservation of funds, of the amount of money reserved for that program, and of the number of units to be provided for in that particular project reservation of funds. Funds are obligated through an Annual Contributions Contract ("ACC"). Once an Indian Housing Authority has presented its development program, including budget, drawings, etc., in its ACC, the ACC is executed by HUD. Once funds are obligated, they are considered to be under contract to the Indian Housing Authority.

None of the testimony indicated that NAHA was improperly recognized by the federal defendants, in a manner that is contrary to custom, policy, practice, or established regulation and statute. Over one year has passed since NAHA was created and a good deal of time has passed since funds have been awarded to NAHA for its housing project with HUD. Accordingly, as to the federal defendants, this Court finds plaintiff does not have standing to bring these issues.

### 2. Subject matter jurisdiction

■ This portion of the Court's ruling considers the claims concerning and challenging NAT's enactment of the ordinance establishing an Indian Housing Authority. This is an act of the Northern Arapaho Tribe which does not raise issues of federal law. The application for funding submitted by NAT to HUD, in and of itself, does not generate a federal issue. Further, the receipt of federal funds or the Northern Arapaho WRHA board members' alleged refusal to attend meetings do not raise federal questions. These are Tribal issues not within the jurisdiction of the federal court.[7]

The theory upon which plaintiff has relied, "common sovereignty" of the two tribes, is one which appears to adopt language intended to analogize what was discussed in *Shoshone I* and *Shoshone II*. These 1930s cases involved considerations of the beneficial incidents of land occupation on the Wind River Reservation by residents and appropriate compensation for takings of property. No law was cited by plaintiff in support of its "common sovereignty" theory. Under that theory, plaintiff argues that where the Tribes choose to act together, but later are unable to agree, it becomes a matter of federal law for resolution by the district court.

The theory asserted by the plaintiff is one which would require the district court to rule on all actions of the two Tribes on the Wind River Reservation and engage in oversight of Tribal activity, whether or not joint activity of the EST and NAT is at issue. Such oversight is not justified or provided for by existing federal law. The NAHA decision to act to seek monies for inadequate housing on the Wind River Reservation is a matter properly committed to Tribal law, funds which are sought and obtained through application to the federal government. *See e.g., The United States for the Use and Benefit of General Rock & Sand Corp. v. Chuska Development Corp.*, 55 F.3d 1491 (10th Cir. 1995) (even though Indian Housing Authority received federal funding for project, that did not necessarily provide a basis for the exercise of federal jurisdiction by the district court); *United States v. Crossland*, 642 F.2d 1113, 1114 (10th Cir.1981) (quoting *Ware v. Richardson*, 347 F.Supp. 344 (W.D.Okla.) where court held it lacked jurisdiction to hear suit brought by members of the Kiowa Tribe against the Kiowa Housing Authority, reasoning that the "controversy was an intratribal dispute and it thus was without federal question jurisdiction.").

Furthermore, the evidence considered by the Court at the hearing suggested that there are a number of activities undertaken by the Tribes separately and which do not appear to preclude independent action by either Tribe under applicable law. It is clear from the uncontroverted testimony at the hearing that there is a substantial need by both Tribes for housing, whether obtained through WRHA or NAHA. The unwritten policy of WRHA providing for a 50/50 division of funds between the EST and NAT has created a sustained disadvantage to the NAT by virtue of their greater population in fulfilling the housing needs of NAT members. This same unwritten policy has also worked to the disadvantage of the WRHA as it affects the determination of eligibility for funds by HUD. The testimony at the hearing,

---

7. Testimony during the hearing indicated that Shoshone Tribal members were eligible to apply for and participate in the NAHA housing program. The NAHA housing project is not located on any jointly owned land; it will be entirely constructed on land owned separately by the NAT. Additionally, the evidence disclosed that NAHA had several Shoshone staff members. NAHA also extended the environmental impact statement comment period an additional 30 days in order to assure that EST had an opportunity to comment. The project coordinator also contacted EST members personally to walk through the project and offer comments. *Testimony of Frank Armajo.*

including the testimony of Vernon Haragara, administrator of the HUD Office of Native American Programs for the Rocky Mountain Region, indicated that the unwritten WRHA policy itself, if indeed that is the policy, is apparently unlawful insofar as it is based upon Tribal membership rather than need.

The testimony at trial failed to support any of plaintiff's contentions that Northern Arapaho members of the WRHA refused to meet. The evidence in fact was quite to the contrary. On July 10, 1995, seventeen days before the effective date of the rescission of funds by Congress in July of 1995, the WRHA Board had approved and enacted its ACC—ample time for submission to HUD prior to rescission. There simply was no explanation why the ACC was not sent to HUD in a timely fashion by WRHA. There was no testimony at all during the hearing that indicated there was any willful action by any of the WRHA Northern Arapaho board members intended to prevent a quorum with the specific intention of preventing submission of WRHA's ACC to HUD in a timely fashion.

### 3. Application for Temporary Restraining Order

■ An applicant for a temporary restraining order must demonstrate: (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. In this case, the Court finds that the plaintiff EST has failed to make a showing sufficient to justify entry of a temporary restraining order or a preliminary injunction in this case.

As to the first prong, there is no substantial likelihood that EST will eventually prevail on the merits. The theory upon which plaintiff relies, "common sovereignty" as out-

lined in the foregoing portions of this order, is novel, untested, and does not provide any assurance of eventually prevailing on the merits. This is not black letter law. Furthermore, even a review of the policy EST seeks to preserve in this instance with respect to WRHA funds suggests that plaintiff would not likely prevail on the merits.

Under the Housing Act, low income housing may be developed pursuant to contracts between HUD and Indian Housing Authorities, such as WRHA and NAHA. Both WRHA and NAHA are entities authorized by law and were created under the power of the Tribes' self government. Both entities have continued to operate under that authority. The instant lawsuit was filed in January of 1996, after a great deal of money had been spent by NAHA in pursuit of its housing project.[8] Modular home units have been purchased and delivered to Riverton; excavation of homesites has begun; substantial funds have been spent for the development of water and sewer systems; contracts have been let; families have been displaced from their homes and are in temporary housing awaiting completion of the NAHA housing project. Now, plaintiff seeks to undo all of this.

Plaintiff offers certain documents in support of its position. For example, plaintiff's Exhibit 1 consists of a constitution and by-laws that have not been adopted by the Shoshone General Council or the Northern Arapaho General Council. This exhibit has little persuasive value in these proceedings. Plaintiff's Exhibit 2, General Council Meeting Minutes is weak evidence and simply reflected the speaker's view of what should be, but did not constitute definitive agency statement or policy. Plaintiff's Exhibit 3, a letter dated March 24, 1952 regarding the Joint Business Council, does not define any method for governance; Plaintiff's Exhibit 4 similarly is of little persuasive value.

In this Court's view, following the two day hearing and considering all of the evidence and testimony, it is unlikely that plaintiff will

---

8. Separate contracts have been entered into by NAHA, including contracts for foundation and dirtwork in the amount of approximately $167,-147.00; contracts for the purchase of modular

homes in the amount of approximately $1,000,-000.00; a contract with the Indian Health Service for sewer and water in the approximate amount of $235,000.00.

succeed on the merits. The Court further finds that the alleged irreparable injury is not immediate or irreparable and money damages, if necessary, are an adequate remedy.

Further, considering the evidence and testimony, the balance of harms factor dictates that the temporary restraining order be denied. One of the plaintiff's witnesses, Matthew Noseep, argued that irreparable harm would occur because housing would not be available for EST members waiting for housing. However, from the evidence at the hearing, it appears that the failure to provide housing for EST and NAT members, through WRHA, can only be traced to the failure to submit the WRHA ACC in a timely fashion to HUD. This loss of funding has not resulted from any activity undertaken by HUD or any of the named federal defendants, NAHA, its non-party board members, or the Northern Arapaho Tribe.

Accordingly, for the foregoing reasons, and as enumerated more fully on the record of the Court's oral rulings from the bench at the hearing, it is therefore

**ORDERED** that the plaintiff's motion for temporary restraining order shall be, and is, **DENIED.** It is further

**ORDERED** that the complaint filed by plaintiff in the above captioned action shall be, and is, **DISMISSED.**